CENTRAL TRUST CO. OF NEW YORK *et al. v.* WABASH, ST. L. & P. RY.
Co. *et al.*, (ST. LOUIS, K. & N. W. RY. Co., Intervenors.)

*(Circuit Court, E. D. Missouri, E. D.* March 19, 1888.)

CONTRACTS—INTERPRETATION—ACTS OF PARTIES.
Where a contract between two railway companies operating a joint line does not expressly provide how cars shall be obtained or supplied for the use of the line, the fact that one company for several years after the contract was entered into paid the other for the use of its cars will be considered as a construction placed on the contract by the parties, and the courts will enforce such payment as a part of the contract.

In Equity. On exceptions to master's report. *In re* intervening petition of St. Louis, Keokuk & Northwestern Railroad Company.

*H. H. Trimble* and *Palmer Trimble*, for petitioner.

*H. S. Priest*, for receivers.

THAYER, J. The question which arises on the intervening claim of the St. Louis, Keokuk & Northwestern Railroad against the receivers of the Wabash Railway Company must be determined with reference to the provisions of a contract entered into on February 4, 1879, between the St. Louis, Kansas City & Northern Railroad as party of the first part, and the intervenor as party of the second part. That contract recited "that the intervenor desired to complete its line of railway from Clarksville, Missouri, to a connection with the railway of the first party at or near Dardenne, now St. Peters, and form a joint line between the railroad companies from St. Louis over the railroad of the first party to the proposed connection, and from thence over the railroad of said second party to Keokuk, Iowa, for the purpose of transporting passengers, freight, mail, and express cars on terms mutually advantageous to both parties. In consideration of the premises, and the undertaking on the part of the second party to construct and complete its road, and make such connection and provide the necessary facilities for such joint business at said connection, the first party agreed with the second party to form such joint line of railway from St. Louis, Missouri, to Keokuk, Iowa, for passenger, freight, mail, and express business, the arrangement to commence as soon as the second party had completed its tracks from Clarkesville to the connection aforesaid, and to continue for 50 years. The party of the first part agreed to furnish all depot and terminal facilities at St. Louis for the joint-line business; also all the motive power to haul the trains of such joint-line business between St. Louis and the junction aforesaid at or near St. Peters, pay all bridge tolls over the St. Charles bridge on the trains and business of the joint line, and give the business of the joint line the same care, attention, and facilities that it gave its own. It was also mutually agreed between the parties that for the services, facilities, motive power, and bridge tolls aforesaid, including station work at the city of St. Louis for such joint line, the said first party should receive thirty-five hundredths of all the earnings of the joint line, and the

second party should receive sixty-five hundredths thereof.    It was mutually agreed that, as far as practicable, time-cards should be arranged so that the trains of the second party might be hauled to and from St. Louis with the trains of the first party, but when not practicable, the first party was to furnish motive power, and haul the trains of the second party on the time of the second party.    It was furthermore agreed that settlements should be made monthly between the parties on or before the 15th day of each month, and that all minor details not mentioned in the contract should be arranged between the parties in a spirit of equity and fairness, and with a due regard to economy."    Such were the material provisions of the contract.    After intervenor's railroad was completed to St. Peters, operations began under the contract, and have been continued to the present time by the St. Louis, Kansas City & Northern Railroad and its successors, to-wit, the Wabash, St. Louis & Pacific Railroad, and the receivers of the last-named corporation.    From the commencement of traffic over the joint line until June 1, 1885, the Kansas City & Northen Railroad, and each of its successors, allowed and paid the intervenor mileage on all its freight, baggage, and passenger cars employed in the business of the joint line, between St. Peters and St. Louis. The mileage so allowed the intervenor was the usual mileage paid by all railroads on foreign cars which pass over their roads when they have an interest in the earnings of the foreign cars, and are not simply paid a certain sum for hauling them.    In June, 1885, a year after the receivers of the Wabash, St. Louis & Pacific Railroad were appointed, they resolved to pay no more mileage on the intervenor's passenger and baggage cars, claiming that the contract under which the joint line was operated did not obligate them to pay such mileage.    They continued, however, to pay mileage on freight cars the same as before, and continued to do so up to the time of the hearing.    The present claim is for mileage on passenger and baggage cars, belonging to the intervenor that passed over the joint line between St. Peters and St. Louis from June 1, 1885, to April 1, 1886.    The sum claimed is $3,544.80, and the same was allowed by the master.    The receivers have excepted to the allowance.

The fact that the St. Louis, Kansas City & Northern Railroad and its successors, while acting under the contract, paid mileage on all the intervenor's freight, baggage, and passenger cars until June, 1885, and that mileage was thereafter paid by the receivers on freight cars, creates a strong presumption that the payment of such mileage was within the contemplation of the parties who made the contract, and that, as they construed it, the contract required the payment of such mileage, either by reason of some provision of the agreement, or because of some usage applicable to the subject-matter of the contract, in the light of which they supposed that the contract ought to be, and would be, interpreted.    The agreement being executory, the practical construction adopted by the parties thereto, and by their successors, during a period of several years, is entitled to great, if not controlling, influence in determining what is the proper interpretation of the same, as was held in *Topliff* v. *Topliff*, 122 U. S. 121, 7 Sup. Ct. Rep. 1057, and *Chicago* v. *Sheldon*, 9 Wall.

54. It is well understood that the practical construction of a contract adopted by the parties thereto will not control or override language that is so plain as to admit of no controversy as to its meaning. In all such cases the intent of the parties must be determined by the language employed rather than by their acts, but if the language employed is of doubtful import, or if the contract contains no provisions on a given point, or if it fails to define with certainty the duties of the parties with respect to a particular matter or in a given emergency, then beyond all question it is proper to consider how the parties have construed the instrument with respect to such debatable points. If both parties to an agreement for a considerable period, and while free to act, treat a contract as imposing certain duties or obligations, such conduct ought to settle the construction of the instrument if its provisions with reference to such matters are to any extent uncertain, obscure, or incomplete. "A construction of a contract adopted and acted upon by both parties will be regarded as worked into the contract," says Dr. Wharton in his work on Contracts, vol. 1, § 206, if such construction does not conflict with its express provisions. The manner in which a construction of a contract adopted and acted upon by both parties may, so to speak, be worked into a contract, is well illustrated in *Topliff* v. *Topliff*, above cited, and also in the case of *Robinson* v. *U. S.*, 13 Wall. 363. In the latter case Robinson had contracted to deliver a certain quantity of barley, but whether the delivery should be made in bulk or in sacks was not specified. For a period of six months the barley was delivered in sacks. The court refer to this fact as a proper reason for construing the contract as requiring a delivery in sacks, rather than in bulk. It will rarely be found, we apprehend, that a court will go far astray in arriving at the actual intent of the parties to a contract (which, after all, is the purpose of all rules of construction) by adopting that interpretation which the parties, without compulsion, have themselves adopted and acted upon. None of the foregoing propositions are directly controverted by the receivers' counsel. The contention on their part seems to be that it matters not how the parties have construed the contract now in question, because its provisions, as they claim, are too plain to admit of any reference to the manner in which they may have interpreted it. Their view seems to be that in the matter of paying mileage the St. Louis, Kansas City & Northern Railroad and its successors not only made payments by way of gratuity, which the contract clearly did not require them to make, but that they have actually paid mileage on cars between St. Peters and St. Louis which the contract obligated the intervenor to furnish free of charge. We remark, in the first place, that it is at least singular that such payments should have been made for several years if the contract on its face really bears such unmistakable evidence that the payment of mileage on intervenor's cars was not contemplated when the contract was made. It is urged, however, that such payments were made without any reference to the contract, and through oversight; but even if that be so, it is certainly the duty of any person, who at this late day contests intervenor's right to mileage under the terms of the contract, to point out some provision

or provisions which in clear and unmistakable language show that such payments were not contemplated.    We think that the receivers' counsel have signally failed to make such showing.    Instead of pointing us to any provision of the contract which clearly made it the duty of the intervenor to furnish freight, baggage, and passenger cars free of charge for the business of the joint line between St. Peters and St. Louis, we are favored with an elaborate argument, the purpose of which is to show that by reason of the situation of the parties at the time the contract was made, and in view of certain provisions of the contract, we ought to infer (although it is not directly expressed) that in point of fact it was the intention of the parties that no compensation should be paid for the use of intervenor's cars between the points last named.    Possibly, we might so infer, and adopt that as the correct exposition of the contract, if the parties themselves (who certainly ought to know what they did intend) had not adopted a different construction of the agreement, and acted upon it consistently for a series of years.    The fact is that the contract under consideration, while it is explicit in some of its provisions, and while it provides clearly what contributions shall be made by the respective parties to establish the joint line, and in what way the earnings of the joint line shall be divided, wholly fails to provide who shall supply cars over the entire joint line, or any part of it for any class of business transacted by such line.    Obviously, the line could not be operated without cars.    The parties must have had some intention with respect to the supply of rolling stock.    But for some reason the contract does not in terms provide who shall furnish it.    This matter was left open by the explicit provisions of the agreement, and is to be determined, if at all, by implication.    On the one hand, as has been before remarked, it is contended that it ought to be inferred from what is expressed that it was intervenor's duty to supply rolling stock between St. Peters and St. Louis free of mileage charges.    On the other hand it is argued with much plausibility and force that no such inference can properly be drawn.    It is urged that the parties intentionally omitted to bind either party to supply all or any specified number of cars for use on the joint line in view of the inherent difficulty of carrying out any such provision, if made. It is furthermore urged that the parties to the contract intended to leave the matter of car supply to be regulated by the exigencies of business, and that, having left the matter to be so regulated, they also intended to allow mileage charges on all of intervenor's cars that were used on the joint line between St. Peters and St. Louis, according to a custom that then prevailed among railroads.    The conduct of the parties accords with the latter view.    We refer to the controversy between counsel as to the proper interpretation of the contract, not with a view of deciding which interpretation ought to prevail if the question was *res integra*, but as evidence of the fact that the contract considered by itself is fairly susceptible of different interpretations, because it does not in terms provide how cars shall be obtained or supplied for the use of the joint line.    Such being the case, and a controversy having now arisen as to the construction of the agreement, we have no doubt that we are authorized to settle the con-

troversy by adopting that construction which the parties have themselves adopted and acted upon invariably for a series of years. We do not hold that the conduct of the St. Louis, Kansas City & Northern Railroad and its successors in paying mileage creates an estoppel against it and its successors, but we do hold that the interpretation so put upon the agreement should determine its true construction, unless it is at variance with the express provisions of the instrument, which in this instance does not appear to us to be the case.

In our opinion, the finding of the master was for the right party, and we accordingly overrule the exceptions, and confirm the report.

BREWER, J., concurs.